IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TRACYE CURRIE, Individually and As Surviving Mother and Personal Representation of the Estate of NODIANA ANTOINE, Deceased, | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. 1:05-CV-1610-BBM |
| CHEVRON U.S.A. INC., and CHEVRON STATIONS INC., | |
| Defendants. | |

**O R D E R**

This action is before the court on the Defendants' Motion to Exclude Certain Opinions of Robert Renkes and Glen Marshall [Doc. No. 113] (hereinafter, "Defs.' Mot. to Exclude Certain Ops."); and Plaintiff's Motion to Exclude the Testimony of Jeffrey M. Shapiro, PE, Robert S. Eagan and Rosemary Erickson, Ph.D. [Doc. No. 114] (hereinafter, "Pl.'s Mot. to Exclude Test."). Also before the court is Plaintiff's Motion for Leave to File Excess Pages [Doc. No. 115], which is GRANTED without discussion.

## I. **Factual and Procedural Background**

Plaintiff Tracye Currie ("Ms. Currie") brought this wrongful death action, both individually and as the personal representative of the estate of Nodiana Antoine ("Ms. Antoine"), against defendants Chevron U.S.A. Inc. and Chevron Stations Inc.

(collectively, "Chevron"). Chevron is the owner and operator of the service station in Cobb County, Georgia where Ms. Antoine was murdered by her girlfriend, Anjail Muhammad ("Ms. Muhammad") on May 25, 2003. Ms. Currie states that the women entered the service station property, where Ms. Muhammad proceeded to douse Ms. Antoine with gasoline from the Chevron station's pump, lead her across the street, and set her alight. Ms. Antoine later died as a result of those injuries.

Ms. Currie brought the instant lawsuit against Chevron on May 19, 2005, on the grounds of negligence, negligence per se, and wrongful death; she requests damages and punitive damages. Chevron removed the action to this court on June 17, 2005, on the basis of diversity jurisdiction.

The parties have filed cross-motions to exclude the opposing party's expert witness testimony: Ms. Currie filed a motion to exclude the opinions of Jeffrey M. Shapiro, PE, Robert S. Eagan, and Rosemary Erickson, Ph.D. [Doc. No. 114]. Chevron filed a motion to exclude the opinions of Robert Renkes and Glen Marshall [Doc. No. 113]. However, since these motions were filed, Chevron agreed that it would not offer the testimony of Mr. Eagan or Mr. Shapiro, and Ms. Currie also agreed not to call Mr. Renkes. Further, the parties agreed that they would offer the testimony of Mr. Marshall and Dr. Erickson solely on the issue of the foreseeability of the crime in

this case.[1]   Therefore, the court will address only the cross-motions to exclude the opinions of Mr. Marshall and Dr. Erickson on the issue of the foreseeability of the crime committed against Ms. Antoine on May 25, 2003.  The court held a hearing on these motions, but the parties elected not to present live testimony from their expert witnesses.

Mr. Marshall proposes to testify that the criminal act at issue in this case was foreseeable and anticipated, and that it is the attendant's responsibility to reasonably anticipate and control the activities of the customers to prevent such incidents.  He bases this opinion on his own personal experience and specific knowledge in the field of petroleum distribution, and specifically what is required from the standpoint of a retail clerk.

Dr. Erickson proposes to testify to the opinion contained in her report dated January 2, 2006 (hereinafter, "Erickson Report"), that Ms. Antoine's homicide was not foreseeable based on the crime in the area, the crime at the location, or the nature of the crime.  (See Erickson Report 9.)  She bases this finding on an examination of the CAP Index for homicide at that location, the specific station's previous crime

---

[1]Chevron had also argued in its Motion to Exclude that Mr. Marshall was not qualified to render expert opinions on the application of Georgia law or the gas station attendant's English language competency.  However, Ms. Currie has agreed not to offer testimony from Mr. Marshall on either of these topics, therefore the court need not address this dispute.

statistics, including the fact that there were no homicides (and in particular no homicides by immolation (burning) at that location), the relative infrequency of homicides by immolation nationwide, and the infrequency of one woman killing another woman.  (Id. 9-10.)

## II.    The Standard for Admitting Expert Testimony Under Rule 702

Admissibility of expert testimony is a preliminary question for the court governed by Federal Rules of Evidence 104(a) and 702.  According to the latter rule,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In interpreting the requirements of this rule, the Supreme Court, in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594-95 (1993), established that for expert testimony to be admissible it must be both relevant and reliable.  The Eleventh Circuit looked to these twin requirements of Rule 702 and Daubert, and fashioned a "rigorous three-part inquiry" to question whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of

> fact, through the application of scientific, technical, or specialized
> expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ." Id.

Looking first to the expert's required qualifications, the Supreme Court once suggested that an expert's testimony must "be scientific . . . knowledge [implying] a grounding in the methods and procedures of science [and connoting] more than subjective belief or unsupported speculation." See Daubert, 509 U.S. at 589-90 (internal quotations and footnote omitted). However, the court has since clarified that while "scientific" training and expertise is one way to qualify, it is not the only way, since "Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies . . . also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). As the Eleventh Circuit has noted, the plain language of Rule 702 suggests that experience in the field alone (rather than scientific or academic work) may lead to this sort of "technical" or "specialized" knowledge. See Frazier, 387 F.3d at 1260-61; see also Fed. R. Evid. 702 advisory committee's note (2000 amends.) (stating that

"[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.").

Of course, even though a court may consider someone an expert, that expert may still offer unreliable testimony. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1342 (11th Cir. 2003). Thus, the second part of the three-part inquiry mandates a determination of the reliability of the expert's methodology, based on an inquiry similar to the one conducted in Daubert. In that case, the Supreme Court considered the following non-exclusive, non-dispositive factors to determine reliability: 1) whether the methodology is testable or has been tested; 2) whether it has been subject to peer review and publication; 3) its error rate; 4) whether standards controlling the technique's operation exist; and 5) whether it has been accepted in the proper scientific community.[2] See Daubert, 509 U.S. at 593-

---

[2]Because of some doubts about how precisely these Daubert factors apply to different types of expert testimony, courts have looked to additional reliability factors, including:

> 1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying; 2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) Whether the expert has adequately accounted for obvious alternative explanations; 4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; [and] 5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note (2000 amends.) (internal quotations and

94.  In conducting this "Daubert-style inquiry" into reliability, courts must focus on the expert's principles and methodology rather than on his or her conclusions.  See id. at 595.  In addition, for expert witnesses qualified on the basis of experience, concerns for reliability mandate that when a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note (2000 amends.).

In the third part of the inquiry -- that is, whether or not the scientific or specialized testimony will assist the trier of fact in determining a fact in issue -- the test for admissibility is whether the opinion "concerns matters that are beyond the understanding of the average lay person."  See Frazier, 387 F.3d at 1262.  Further, proffered expert testimony will not assist the trier of fact if it offers no more than what counsel could argue at trial.  Id. at 1262-63 (citing 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 702.03[2][a]).

Finally, it bears noting that this "gatekeeper" function does not imbue trial courts with the authority to give their imprimatur to the theories of expert witnesses or "make ultimate conclusions as to the persuasiveness of the proffered evidence,"

_____

citations omitted).

Quiet Tech., 326 F.3d at 1341, but rather only to ensure that an expert's testimony is well-grounded in sound scientific or other specialized methods and principles.  See Kumho Tire, 526 U.S. at 152 ("The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. . . . [such that the expert] employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").  The Supreme Court and Eleventh Circuit both caution that the trial court must not "supplant the adversary system or the role of the jury:  'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  Allison v. McGhan Med. Corp., 184 F.3d 1300 (11th Cir. 1999) (quoting Daubert, 509 U.S. at 596).  With these considerations in mind, the court turns to the specific expert opinions at issue.  **III.**

**Analysis of Dr. Erickson's Opinion Testimony**

Based on her reading of Daubert, Ms. Currie argues that Dr. Erickson's opinion that the crime of homicide was not foreseeable to Chevron is not the product of reliable principles and methods, that she did not apply her methods reliably to the facts here, and that she will not assist the trier of fact.  Chevron counters by stating that Dr. Erickson's testimony is in fact reliable, and that Ms. Currie's criticisms go only to the weight to be given to Dr. Erickson's testimony, not to its admissibility.

As mentioned above, under the "rigorous three-part inquiry" as mandated in Frazier, the court must determine whether:  1) Dr. Erickson is qualified to testify competently regarding the matters she intends to address, 2) the methodology she uses is sufficiently reliable (based on an inquiry similar to the one used in Daubert), and 3) her scientific or specialized knowledge testimony will assist the trier of fact. See Frazier, 387 F.3d at 1260.  The court will examine each of these in turn.

### A.    Dr. Erickson's Qualifications Regarding Crime Foreseeability

First, Dr. Erickson is qualified to testify competently regarding crime foreseeability.  Dr. Erickson is a forensic sociologist with a Ph.D. in Sociology and Justice from American University.  She has over twenty-five years of experience studying crime and has taught, lectured, and published a number of peer-reviewed articles on the topic of crime, and specifically crime at service stations and convenience stores.  She has also provided expert testimony on the foreseeability of specific crimes on a number of different occasions.  Importantly, Ms. Currie does not dispute that Dr. Erickson is qualified to testify competently regarding the issue of the

foreseeability of specific crimes.[3]  The court finds that Chevron has carried its burden of showing that its expert is qualified to testify as to crime foreseeability.

### B.    Reliability of Dr. Erickson's Methodology

Although Dr. Erickson is qualified as an expert, all of her opinions are not necessarily therefore reliable expert testimony.  See Quiet Tech., 326 F.3d at 1342. This court must thus determine whether her methodology is sufficiently reliable as mandated by the sort of inquiry used in Daubert, including a review of such factors as whether her technique or theory can be tested, whether it has been subjected to peer review and publication, its error rate, the existence and maintenance of standards and controls, and whether it is generally accepted in the relevant expert community.[4]  See Daubert, 509 U.S. at 593-94.

The preliminary task before the court is to define the relevant "methodology" Dr. Erickson used in forming her opinion.  Dr. Erickson states that there are three

---

[3]Ms Currie does, however, argue that "foreseeability" is a legal, rather than academic, matter, and better left to the sole province of the jury rather than to experts.  (See Pl.'s Reply Mem. of Law to Mot. to Exclude Test. 15.)  While it is certainly true that "the question of reasonable foreseeability of a criminal attack is generally for a jury's determination rather than summary adjudication by the courts," Sturbridge Partners v. Walker, 267 Ga. 785, 786-787, 482 S.E.2d 339, 341 (1997) (internal quotations and citation omitted), an expert may testify as to any issue that "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, including even the "ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704.

[4]Ms. Currie mentions but does not address these factors individually.  (See Mem. of Law in Supp. of Pl.'s Mot. to Exclude Test. 34.)

common methods of social science research:  experiments, survey research, and secondary data analysis.  (See Erickson Decl. ¶ 6.)  Dr. Erickson relied upon the third technique, secondary data analysis, which involves "the analysis of existing, available data to analyze a particular question or issue."  (Id.) (citing Royce A. Singleton, Analysis of Secondary Data, in Approaches to Social Research 357-93 (Oxford Univ. Press, 4th ed. 2004)).  According to Chevron, "analysis of secondary data is a commonly utilized and accepted analytical method in a variety of fields, including forensic sociology."[5]  (See Defs.' Resp. to Pl.'s Mot. to Exclude Test. 22.)

Ms. Currie apparently does not dispute that secondary data analysis is a well-accepted research methodology.  Rather, she disputes both Dr. Erickson's specific method of forming an opinion on foreseeability, and the questionable and selective ways in which she analyzed the data obtained.[6]  Cf. Quiet Tech., 326 F.3d at 1343

---

[5]Of course, even though "secondary data analysis" is accepted, the relevant reliability question goes to the expert's application of that methodology.  For instance, Dr. Erickson also notes that "experiments" are a common method of social science research, yet certainly there are different ways, including countless unreliable ways, of conducting experiments.

[6]Specifically, Ms. Currie argues that "Dr. Erickson used an invalid statistical sample to predict whether the exact crime could have occurred in this case, she improperly played the result of the statistics to effectively skew and validate her opinions, she ignored or failed to properly consider the testimony of witnesses to the incident, and she did absolutely no research to determine if events such as this had ever occurred to Chevron or even in the petroleum industry."  (See Pl.'s Resp. to Defs.' Mem. of Law to Exclude Certain Ops. 5.)

(noting that the parties had distinguished "between the reliability of computational fluid dynamics generally and of [the expert's] application of CFD in this case"). The court will thus examine both the reliability of Dr. Erickson's "foreseeability" methodology generally, and the way she used that methodology in forming her opinion.

The relevant methodology here is not secondary data analysis generally, as Chevron appears to suggest, but rather Dr. Erickson's specific use of that technique in conducting her foreseeability analysis. The court must thus perform an "exacting analysis" of the foundations of Dr. Erickson's opinion on foreseeability to ensure that it meets the standards for admissibility of testimony under Rule 702. See Frazier, 387 F.3d at 1260 (citation omitted).

Dr. Erickson states that foreseeability is a concept frequently used in forensic psychology, involving the "degree to which a particular crime or type of crime was predictable or more likely than not to occur." (See Erickson Decl. ¶ 5.) She states that this sort of analysis is commonly performed after a criminal incident in order to determine whether a company ought to make changes to its crime prevention procedures, and that she regularly assists companies with crime foreseeability analyses using a "methodology very similar to the one [she] performed in this case." (Id. ¶ 4.) Dr. Erickson claims to have utilized "this methodology" when retained by

operators of service stations and convenience stores to analyze crime, has described it in another article, and has utilized it in a peer-reviewed article and in chapters of two books.  (Id. ¶ 7.)  Despite the obvious ambiguity as to whether the "methodology" she is referring to is secondary data analysis generally or her "foreseeability analysis" specifically, Ms. Currie fails to cite any authority or record evidence suggesting that Dr. Erickson has not used this foreseeability analysis technique in the past or that it is not generally reliable.

Nevertheless, Dr. Erickson's technique deserves a closer look.[7]  Dr. Erickson rendered her opinion for Chevron by gathering "data on various factors that influence the foreseeability of Muhammad's crime--a homicide by fire . . .[,] reviewed all this information, then formulated opinions about whether each factor made this crime either more or less foreseeable."  (See Defs.' Resp. to Pl.'s Mot. to Exclude Test. 21-22.)  Her analysis appears to be premised on the idea that foreseeability is "based on" the following three main factors:  1) crime in the area, 2) crime at the location, and 3) the unusual nature of the crime.  (See Erickson Report 4.)   The court finds it

---

[7]The court recognizes that secondary data analysis is a standard methodology for sociologists and criminologists (see Defs.' Resp. to Pl.'s Mot. to Exclude Test. 22), but notes that the record is not entirely clear as to whether Dr. Erickson's methodology for determining "foreseeability" has ever been tested, published, peer-reviewed, what its error rate is, whether there are any standards controlling the use of her technique, or whether it is generally accepted in the relevant scientific community.  See Daubert, 509 U.S. at 593-94.

helpful to examine each of these factors in turn in evaluating the reliability of her methodology.

### 1.    Crime in the Area

For crime in the area, she relied on the CAP Index, which Dr. Erickson calls a "sophisticated computer analysis designed to identify the risk of crime at a location." (See Erickson Report 4).  According to Chevron, "[i]nformation from [the] CAP Index is commonly used in the field of forensic sociology and is a well-accepted source for reliable crime statistics," and "Dr. Erickson regularly uses CAP Index information when she advises her clients on site selection."  (See Defs.' Resp. to Pl.'s Mot. to Exclude Test. 24-25.)   Ms. Currie does not argue that Dr. Erickson analyzed the score incorrectly, nor does she convincingly dispute the CAP Index's reliability in analyzing the likelihood of crime at a particular location.[8]   Rather, she argues that the CAP Index is invalid as a determiner of foreseeability in this case, because "[i]n trying to determine the probability of a very specific form of crime, homicide by fire, Dr. Erickson relies on a sample derived from the CAP index, which includes instances of *all* crime."  (See Pl.'s Reply Mem. of Law to Exclude Test. 17.)  The court understands

---

[8]Although Ms. Currie states that "there is no evidence of whether the reliability of a CAP Index is a recognized method by her peers to forecast crime," she cites no authority actually questioning the Index's utility in crime forecasting.  (See Pl.'s Mem. of Law in Supp. of Mot. to Exclude Test. 36.)

this argument to be that although homicide by immolation is rare, it is more foreseeable at a gas station than elsewhere, and thus comparing homicides by immolation to *all* homicides across the country skews the results to make this crime seem less foreseeable to Chevron than it actually was.  However, this point addresses the weight afforded Dr. Erickson's testimony, not its reliability or admissibility, and should be taken up on cross-examination.  See <u>Quiet Tech.</u>, 326 F.3d at 1345 ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.") (internal quotations and citation omitted).  Since Ms. Currie cites no authority challenging the reliability of the use of CAP Index scores to measure the relative foreseeability of crime in a particular area, the court finds that Dr. Erickson's use of such scores is sufficiently reliable, as is her discussion of "crime in the area."

### 2.    Crime at the Location

Turning to Dr. Erickson's second factor, crime at the location, Dr. Erickson reviewed the results of Chevron's search of its records, and found that there had never been a homicide at that station.  (<u>See</u> Erickson Report 5-6.)  She also saw no evidence in the ten years prior to this homicide "that an event such as this, or an event remotely similar to this, had happened at any Chevron location."  (<u>Id.</u> 6.)  Ms. Currie argues that Dr. Erickson "did absolutely no research to determine if events

such as this had ever occurred to Chevron or even in the Petroleum industry," and that Dr. Erickson also should have taken into account other similar incidents, such as three prior incidents at Chevron stations where someone had improperly dispensed gasoline either into an unapproved container or with no container at all. (See Pl.'s Mem. of Law in Supp. of Mot. to Exclude Test. 38-40.)  Chevron counters that Dr. Erickson did in fact review those three incidents, but determined that they were not sufficiently similar to the present homicide to merit comparison.  (See Defs.' Resp. to Pl.'s Mot. to Exclude Test. 30.)  Again, however, issues such as whether she should have conducted independent research instead of relying on Chevron's records, or whether she should have discussed any arguably similar incidents in her foreseeability opinion, go to the weight given to, rather than the reliability of, her testimony, and this issue may properly be addressed during cross-examination.  See Quiet Tech., 326 F.3d at 1345.  Because Ms. Currie does not appear to dispute that evidence of prior crimes at the location is relevant to the foreseeability of future crimes at that same location, and Chevron asserts that this technique has been used and is reliable, the portion of Dr. Erickson's foreseeability opinion regarding "crime at the location" is sufficiently reliable.

### 3. The Unusual Nature of the Crime

Finally, the court turns to the third major factor in Dr. Erickson's foreseeability opinion, the unusual nature of the crime. For this factor, Dr. Erickson relied on the FBI's Uniform Crime Report ("FBI UCR") to compare specific aspects of the crime in question with the number of times they occurred nationwide, as well as the Supplemental Homicide Report, which contains additional data on homicides specifically, such as "age, sex, race of victim and offender, type of weapon used, the relationship of victim to the offender, and the circumstances surrounding the incident." (See Erickson Decl. ¶ 9.)

Dr. Erickson first notes the relative infrequency of such "homicides by immolation" nationwide, at least in comparison to other forms of homicide. (See Erickson Report 6.)    Ms. Currie, in response, argues that the relevant question in this case is not whether the specific crime of homicide by immolation was foreseeable, but whether "some injury" was foreseeable. See Newmann v. United States, 938 F.2d 1258, 1263 (11th Cir. 1991). Ms. Currie thus argues that Dr. Erickson's Report is unreliable since she didn't inquire into assaults and attempted murders by immolation.[9]

---

[9]In her deposition, Dr. Erickson stated:
Q. "Your -- your research revealed that, in 2003, there were 163 homicides by fire?
A. Yes.
Q. How many aggravated assaults by fire were there?
A. I didn't look that up since this was a homicide.

Chevron responds in several ways.  First, Dr. Erickson states that she did not consider assaults and attempted murders generally because they were not relevant,[10] and she did not consider assaults and attempted murders by immolation specifically because the FBI UCR does not carry that kind of data (though she states that such statistics would be of "limited relevance").[11]   Again, the court finds that these assertions as to the relevance of non-homicide crimes go to the weight of Dr. Erickson's testimony, and may be explored on cross-examination.

Second, Chevron points out that in negligence cases under Georgia law involving intervening criminal acts, the "duty to exercise ordinary care to protect [invitees] against third-party criminal attacks extends *only* to *foreseeable* criminal acts."  (Defs.' Resp. to Pl.'s Mot. to Exclude Test. 16) (citing Sturbridge Partners, 267 Ga. at 785-86, 482 S.E.2d at 340).   The foreseeability issue here is thus whether Chevron had sufficient reason to anticipate the risk of such a criminal act so as to

---

Q. How many attempted murders by fire?
A. I didn't look that up.
(Deposition of Rosemary J. Erickson, Ph.D., 61:18-24, Jan. 26, 2006.)

[10]According to Dr. Erickson, "I considered homicides, rather than other crimes, because the crime committed by Muhammad was, in fact, a homicide.  It would be inappropriate to consider the prevalence of other crimes, such as assaults, in evaluating the foreseeability of a homicide."  (See Erickson Decl. ¶ 14.)

[11]Dr. Erickson stated:  "Some statistics which may have some limited relevance, such as aggravated assaults by fire, are not captured by any reliable data source."  (See Erickson Decl. ¶ 14.)

give rise to a duty to exercise ordinary care to guard against this injury.  <u>See</u> <u>Sturbridge Partners</u>, 267 Ga. at 786, 482 S.E.2d at 341.  Chevron has clearly defined the foreseeability question much more narrowly than Ms. Currie,[12] but if Ms. Currie feels that Dr. Erickson's foreseeability opinion is too narrow, that is the proper subject of inquiry on cross-examination.  Further, the fact that Chevron has defined the foreseeability issue narrowly does not make Dr. Erickson's finding of the infrequency of such homicides "unreliable."  Ms. Currie herself acknowledges that "homicide by immolation is a relatively rare occurrence nationally" as compared to homicide with firearms and knives.  (<u>See</u> Pl.'s Mem. of Law in Supp. of Mot. to Exclude Test. 34.) Finally, the court again understands Ms. Currie to argue that although homicide by immolation is rare, it is relatively more foreseeable at a gas station, and the foreseeability question is whether *this crime* was foreseeable to *Chevron* -- not whether it was somehow foreseeable as compared to all murders nationwide.  Though this point is well taken by the court, it once again goes to the relative weight to be afforded Dr. Erickson's testimony, not its reliability.  Thus, expert testimony regarding the "unusual nature of this crime" arrived at by comparing the rate of homicide by

---

[12]Chevron states that it framed the foreseeability question to its expert in the following way:  "[W]as it foreseeable that Muhammad would murder Antoine by using the dispenser to douse her with gasoline, then setting her on fire across the street?"  (<u>See</u> Defs.' Resp. to Pl.'s Mot. to Exclude Test. 18.)

immolation to the homicide rate nationally is a proper subject for testimony, and is sufficiently reliable to survive this challenge under <u>Daubert</u>.

However, the court does have serious doubts about the reliability of another aspect of this part of Dr. Erickson's methodology. Specifically, the court is concerned about the portion of Dr. Erickson's Report under "Unusual Nature of the Crime" in which she goes beyond the national comparison of homicides generally to homicides by immolation.

In further examining the "unusual nature of the crime," Dr. Erickson looked at various factors besides the unusual type of homicide itself, such as "data regarding the prevalence of female-on-female violent crimes, crimes by young adults, information regarding the prior relationship between Muhammad and Antoine, etc."[13]  (Defs.' Resp. to Pl.'s Mot. to Exclude Test. 21.)  As Chevron points out, Dr. Erickson opines on the "foreseeability of this crime from an *objective* standpoint, not from the perspective of various individuals.  Thus, what an individual person knew or believed about the crime is not relevant to her analysis."  (<u>Id.</u> at 29.) (emphasis added)  This being the case, the court cannot square Dr. Erickson's somewhat

---

[13]By "etc.," Chevron is apparently referring to Dr. Erickson's discussion of two other factors:  Muhammad's use of a "Weapon of Opportunity," and classifying "The Type of Crime" as a "spontaneous domestic homicide," based upon the Crime Classification Manual ("CCM").  (<u>See</u> Erickson Report 8-9.)

selective discussion on the personal attributes of the victim and perpetrator, such  as the age and gender of the participants, their prior relationship, the fact that the murderer used a "weapon of opportunity," and how the CCM classifies this incident. In particular, Dr. Erickson's discussion of certain variables, such as the personal history between Ms. Antoine and Ms. Muhammad, seems to have no relevance at all to the foreseeability question at issue in this case.[14]                   There is a complete absence of any discussion in Dr. Erickson's opinion about why she chose certain variables, such as age of the victim, and not other variables, such as the age of the perpetrator. Dr. Erickson also often fails to make any meaningful statistical inquiry into, or comparison between, the variables analyzed.  For example, she simply points out that there were only ten females murdered by fire between the ages of seventeen and nineteen in 2003, but fails to place that number in any sort of context, and also fails to explain how this number relates to whether Chevron could or should have foreseen

---

[14]For example, Dr. Erickson notes the following in her foreseeability opinion:
> [Muhammad's and Antoine's] prior tumultuous relationship was something that the victim had knowledge of, . . . but Chevron did not. Even with that knowledge, the victim said to the EMS team that she 'didn't think she would do it.'  In other words, the assault was unexpected, and unforeseeable, even to the victim, who had been in the relationship for over two years."

(See Erickson Report 8.)  In the court's view, whether the murder victim expected to be killed has no bearing on whether this act was foreseeable to Chevron.

this particular criminal act.[15]  (See Erickson Report 7.)

Further, Dr. Erickson never mentions the word "race," and does not explain why she decided not to take that variable into account.  Importantly, race is the only Supplemental Homicide Report variable mentioned in her Declaration that she failed to discuss in her foreseeability Report.[16]  Having reviewed the articles Dr. Erickson offered to the court as examples of her methodology, the court is aware that Dr. Erickson has previously stressed the correlation between race and violent crime in her writings.[17]

Dr. Erickson may have excellent reasons for not analyzing race, the age of the

---

[15]Dr. Erickson's failure to provide context is particularly questionable in light of the fact that she neglects to mention other information that would seemingly be relevant according to her methodology.  For example, she fails to mention in her Report that both the perpetrator and victim fall within the age group (eighteen to twenty-five) that has the highest level of violent crime associated with it.  (See Erickson Dep. 35:5-8.)

[16]As noted, Dr. Erickson relies upon both the FBI UCR and the Supplemental Homicide Report in formulating her opinion.  The Supplemental Homicide Report includes "additional information on age, sex, *race of victim and offender*, type of weapon used, the relationship of the victim to the offender, and the circumstances surrounding the incident." (See Erickson Decl. ¶ 9.) (emphasis added).  Dr. Erickson mentions each of these variables in her Report except the race of the victim and offender and the age of the offender.

[17]See, e.g., R.J. Erickson & W.J. Crow, "Violence in Business Settings," *23* American Behavioral Scientist, 717, 721 (1980) ("[B]lack offenders are disproportionately involved in violent crimes; in 1976, more than half those arrested for murder, nearly half of those arrested for rape, and two-fifths of those arrested for aggravated assault were black. . . . The demographics of violent offenders are much like those of their victims.  Blacks mainly victimize blacks . . . .")

perpetrator, or other variables, but she did not mention those reasons in her Report. In the absence of such an explanation, the court cannot help but notice that the common element in each of Dr. Erickson's chosen variables is that they all make this crime appear less foreseeable.  The district courts perform a gatekeeping function to make sure that only expert testimony based on sound scientific principles gets to the jury, see Daubert, 509 U.S. at 589-90, 597, and discussing only those variables that support Chevron's defense does not exemplify the sort of "intellectual rigor" that the Supreme Court requires for expert testimony.  See Kumho Tire, 526 U.S. at 152 (noting that gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

Dr. Erickson states that she chose the factors she did because "based upon her years of experience studying criminals and their crimes, she determined that these factors influence the foreseeability of this particular event."  (See Defs.' Resp. to Pl.'s Mot. to Exclude Test. 21.).  Boiled down, then, the methodology Dr. Erickson appears to have employed is not a determination of whether this crime was more or less foreseeable -- in fact there is no discussion of any factor that makes this crime "more foreseeable" -- but rather a checklist of aspects of this homicide that are particularly

unusual (and hence, apparently, less foreseeable).  (See Erickson Report 7.) ("The crime is also unforeseeable because it is so unusual, thus unforeseeable . . . .")  But unusualness and foreseeability are not the same thing.  There is a clear and necessary distinction between how unusual this specific crime was -- it was clearly so -- and whether Chevron could or should have foreseen this type of crime, based on its knowledge of prior similar criminal acts.  In other words, Dr. Erickson's opinion may reliably tell us how rare it is for a female to kill her 18-year-old female lover by immolation, when compared to a census of national homicides.  But the court has serious doubts about the use of such variables to determine the "foreseeability" question here, for it seems that many crimes could similarly be deemed "unforeseeable" by focusing on their most unusual aspects, when it is really the foreseeability of a criminal act itself, and not the perpetrator's age or gender, that is at issue.

Dr. Erickson states that the concept of foreseeability in sociology is the "degree to which a particular crime or type of crime was predictable or more likely than not to occur."  (See Erickson Decl. ¶ 5.)  Here, though, she is not reliably opining about whether this crime was "more likely *than not* to occur"; rather, she makes the unremarkable suggestion that murders are more likely to be committed by men with guns than by women with gas nozzles and lighters.  But foreseeability in this case is

not about whether the crime was committed by a woman or the nature of the relationship of the victim and the perpetrator.  What matters is whether this crime or type of crime was foreseeable to Chevron, and Dr. Erickson's testimony should thus be limited accordingly.

Regarding the shortcomings of this aspect of Dr. Erickson's opinion, usually these problems would nevertheless go to the weight rather than to the reliability of her opinion, and would be more appropriately addressed during cross examination.  See Quiet Tech., 326 F.3d at 1345 (citing cases on the "role of cross-examination").  However, the court has sufficient concerns with the lack of rigor associated with this aspect of her opinion so as to exclude entirely the portion of her proposed testimony regarding these additional variables and their relation to the unusual nature of the crime.

In sum, the court finds that Dr. Erickson's testimony is sufficiently reliable under Rule 702 and Daubert to testify as to:  the crime in the area, the crime at the location, and the relative infrequency of homicides by immolation.  However, Dr. Erickson may not testify as to the other aspects of her foreseeability opinion having to do with the unusual nature of the crime, such as the age, gender, and prior relationship of the participants, the fact that the perpetrator used a weapon of opportunity, and the type of crime as classified by the CCM.

### C.     Helpfulness to the Trier of Fact

Finally, turning to the third part of the three-part inquiry, the court must determine whether Dr. Erickson's testimony will assist the trier of fact through scientific or other specialized knowledge to determine a fact in issue. In its April 10, 2006 Order, in its discussion of Foreseeability in the section on "Premises Liability Analysis -- Active Negligence," this court found "there to be a genuine issue of material fact as to whether Chevron had notice of 'the dangerous condition' resulting in this litigation." (See Order Den. Mots. Summ. J. 11, Apr. 10, 2006). There is thus a jury issue as to whether Chevron could have reasonably anticipated this crime so as to be on notice of the risk and thus give rise to a duty of care. Dr. Erickson may testify here to her opinion that this incident was not foreseeable to Chevron (with the exception of those above-discussed aspects of the opinion the court found insufficiently reliable[18]) because her analysis will assist the trier of fact to determine the fact in issue.

### IV.     Analysis of Mr. Marshall's Opinion Testimony

---

[18]As noted, the court deemed certain aspects of Dr. Erickson's opinion too unreliable to offer as testimony. For similar reasons, the same aspects of her Report would be excluded because they are not helpful to the trier of fact. In other words, knowing the unique aspects of the murder (such as how statistically rare it is for a woman to kill another woman) will not assist the trier of fact on whether Chevron could reasonably anticipate this risk so as to give rise to a duty to take ordinary precautions to protect its customers. See Sturbridge Partners, 267 Ga. at 787, 482 S.E.2d at 341.

The court now turns to Chevron's motion to exclude the testimony of Mr. Marshall on the basis that he is unqualified to provide an expert opinion regarding the foreseeability of Ms. Muhammad's criminal act, and that his opinion is not the product of a reliable, scientific methodology.  (See Defs.' Mem. of Law in Supp. of Mot. to Exclude Certain Ops. 7).  As above, under the "rigorous three-part inquiry" as mandated by Frazier, the court must determine whether:  1) Mr. Marshall is qualified to testify competently regarding the matters he intends to address, 2) the methodology he uses is sufficiently reliable (based on an inquiry similar to the one used in Daubert), and 3) his scientific or specialized knowledge testimony will assist the trier of fact.  See Frazier, 387 F.3d at 1260.

Chevron disputes that Mr. Marshall is qualified to offer an opinion on the foreseeability of this crime, since he has no "education, training, experience, skill, or knowledge in any discipline--forensic sociology, premises security, law enforcement, criminology, forensic psychiatry, etc.--that could conceivably qualify him as an expert in this area."  (See Defs.' Mem. of Law in Supp. of Mot. to Exclude Certain Ops. 8.)  Ms. Currie responds that Mr. Marshall is a Registered Professional Engineer with a degree in BSME and thirty-one years of experience in retail motor fuel sales.  (See Pl.'s Resp. to Defs.' Mem. of Law to Exclude Certain Ops. 3.)  Ms. Currie further points out that he has extensive knowledge in service station attendant responsibilities, the

workings of motor fuel UST systems and dispensing equipment, as well as experience

as a member of the NFPA-30A Code Committee.    (See id.)

However, although it appears that Mr.  Marshall would be qualified to render

expert opinions on various topics, he is not "qualified to testify competently

regarding the matters he intended to address":  i.e., foreseeability of crime.  See

Frazier, 387 F.3d at 1260 (internal quotations and citation omitted).  The extent of his

qualifications having to do with crime foreseeability and predicting, apparently, is

> that while working in the petroleum industry he has seen several
> instances of criminal acts at gas stations, including one where an
> individual doused another with gasoline directly from the hose, another
> where a customer used their car to pin a person against a gasoline
> dispenser, and yet another where an individual threw gasoline on
> another using a cup. . . . He opines that it is the attendant's responsibility
> to reasonably anticipate and control the activities of the customers to
> prevent such incidents.

(Pl.'s Resp. to Defs.' Mem. of Law to Exclude Certain Ops. 5-6.) (internal footnote and

citations omitted).

These qualifications simply do not make him an expert on crime foreseeability.

First, he does not appear to have any sort of background in law enforcement, security,

or the study of crime.  For example, his engineering qualifications are not similar to

the qualifications of experts other courts have found qualified to testify under the

Daubert standard.  See, e.g., Storts v. Hardee's Food Sys., Inc., No. 98-3285, 2000 U.S.

App. LEXIS 6307, at *36-37 (10th Cir. Apr. 6, 2000) (finding expert testimony admissible on crime foreseeability in case involving mugging outside restaurant, where first expert "has an extensive background in law enforcement and crime prevention and has personal knowledge of the Kansas Turnpike, and [second expert] has extensive background in the [sic] restaurant management and security, particularly with fast food restaurants"); Kerlec v. E-Z Serve Convenience Stores, Inc., No. 97-2577, 1998 U.S. Dist. LEXIS 14598, at *2 (E.D. La. Sept. 16, 1998) (allowing expert witness with "Ph.D. in sociology with a specialty in criminology, extensive experience in security analysis and consulting, and is widely published in the area of crime prevention" to offer relevant conclusions including the foreseeablity of the crime).

In addition, Mr. Marshall revealed himself during his deposition to be at least somewhat unfamiliar with the concept of crime foreseeability as relevant to this litigation.[19]  This fact, along with his lack of relevant experience in the area of crime

---

[19]Mr. Marshall stated the following:

A:    And dousing somebody with gasoline directly from the hose is --that should have been preventable.  That should have been reasonably foreseeable.

Q:    Well, let's see.  That -- reasonably foreseeable and preventable are two different things.  Would you agree?

A:    I'm not sure they really are.

Q:    Okay.  Well, foreseeability has a -- has a meaning in the law.

A:    Okay.  I don't know what the legal meaning is.

foreseeability (and basic lack of expertise in matters of crime and security in general) suggest to this court that he is not qualified to render an opinion on foreseeability in this case.  While experience alone may render an expert qualified to give opinions on a specific topic, the experience must be relevant to his proposed testimony.  <u>See</u> <u>Frazier</u>, 387 F.3d at 1260-61 (holding that an expert must be "qualified to testify competently regarding the matters he intend[s] to address") (internal quotations and citation omitted).  Even though the court can assume for the sake of argument that Mr. Marshall can "provide assistance to the jury on the level of diligence required by the standard of care for retail clerks in regard to what type of incidents should be expected to possibly occur," that is not the relevant question.  (Pl.'s Resp. to Defs.' Mem. of Law to Exclude Certain Ops. 7.)  Rather, the question is whether this crime was foreseeable to Chevron, and Mr. Marshall is not qualified to offer an opinion on that question.

Having found that Mr. Marshall is unqualified to render an expert opinion  on whether this crime was foreseeable, the court has no occasion to determine whether, in accordance with <u>Frazier</u>, he employed sufficiently reliable methodology in forming this opinion, or whether his scientific or specialized knowledge would assist the trier

---

(Dep. of Glen R. Marshall, P.E., 161:3-13, Jan. 13, 2006.)

of fact.  See Frazier, 387 F.3d at 1260.  Therefore, the Defendants' Motion to Exclude

Mr. Marshall's testimony on foreseeability is GRANTED.

## V.    **Summary**

Defendants' Motion to Exclude Certain Opinions of Robert Renkes and Glen

Marshall [Doc. No. 113] is GRANTED; and Plaintiff's Motion to Exclude the

Testimony of Jeffrey M. Shapiro, PE, Robert S. Eagan and Rosemary Erickson, Ph.D.

[Doc. No. 114] is GRANTED IN PART AND DENIED IN PART, as specified above.

Ms. Currie's Motion for Leave to File Excess Pages [Doc. No. 115] is GRANTED.

IT IS SO ORDERED, this 19th day of September, 2006.


s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE